**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 15-CV-00411-RBJ

**ROBERTA CHAVEZ**,
   Plaintiff,

v.

**ADAMS COUNTY SCHOOL DISTRICT NO. 50**,
   Defendant.

_____

**RESPONSE TO MOTION FOR SUMMARY JUDGMENT**
_____

  The Plaintiff, Roberta Chavez ("Chavez"), by and through her attorneys, Brooke M.

Copass and Sharyn E. Dreyer of the Colorado Education Association, hereby responds to

Defendant's Motion for Summary Judgment [Docket ID # 28], opposing the motion for the

reasons herein set forth:

**INTRODUCTION**

  Chavez alleges that the Defendant constructively discharged her from her employment

after subjecting her to a hostile work environment based on her age, national origin, and

disability.  She also alleges that the Defendant retaliated against her after she filed charges of

discrimination with the United States Equal Employment Opportunity Commission ("EEOC") by

rating her performance as "unsatisfactory," imposing disproportionate discipline on her

compared to her colleagues, forcing her to transfer schools, and constructively discharging her.

  The Defendant argues that summary judgment should be granted, contending that: (1)

Chavez' hostile work environment claims are barred by *Faragher/Ellerth;* (2) Chavez was not

subjected to a hostile work environment; (3) Chavez failed to exhaust her administrative

remedies; (4) Chavez was not disabled; (5) Chavez cannot prove her *prima facie* case of

retaliation; and (6) Defendant's reasons for Chavez' disciplinary actions, evaluations, and

transfer were not pretextual.  At a minimum, Chavez has established the existence of genuinely

disputed material facts sufficient to defeat Defendant's motion.  Thus, the Court should deny

Defendant's Motion for Summary Judgment ("MSJ").

## STATEMENT OF FACTS

1.      While true that the Defendant has non-discrimination policies in place, those

policies are more accommodating to an "aggrieved individual" than Defendant implies.  SMJ, p.

2, ¶ 3.  Board Policy AC-R *encourages* an aggrieved individual to report instances of

discrimination, adding that the individual *may* file a complaint with the compliance officer.

MSJ, Ex. A to Ex. 2.  In addition, Board Policy AC-R states that "[a]ll reports received by …

principals … shall be promptly forwarded to the compliance officer," implying that an individual

may make a complaint to their principal rather than the compliance offer.  *Id.*

2.      Chavez denies that her co-workers and supervisors did not perceive her as

disabled.  SMJ, p. 2, ¶ 4.  For example, her co-worker, Charlene Wright ("Wright"), believed

Chavez should not spend much time on the floor with the children because it would be too

difficult for her to get up.  Ex. A, Chavez Depo., 35:8-16.  In addition, Assistant Principal Tami

Brungard ("Brungard") told Chavez she could not work with Wright during the 2012-2013

school year because Wright would be working with only 3-year-olds and they are "too

rambunctious."  Ex. A, 64:23-65:3.

3.      Chavez requested a transfer at the end of the 2011-2012 school year only because

"of how [she] was feeling" – her depression – caused by the Defendant's treatment of her.  Ex.

A, 120:18-121:3, 247:7-9, 264:21-23.  In response to Chavez' request, Principal Mat Aubuchon

("Aubuchon") stated that he could not help Chavez.  *Id.* at 123:6-10.

4.      In response to ¶ 9 of the MSJ, Chavez felt discriminated against by Brungard when reassignments were made for the 2012-2013 school year.  Ex. A, 98:14-17.  When those reassignments were made, Chavez was not given the same assignment options as everyone else who was to be reassigned.  *Id.* at 98:18-23.  In addition, Brungard told Chavez she could not work with Wright during the 2012-2013 school year because Wright would be working with only 3-year-olds and they are "too rambunctious."  *Id.* at 64:23-65:3.

5.      While true that Chavez knew how to use the time clock system, MSJ, p. 3, ¶ 10, she did not know where to access the system at Hodgkins.  Ex. A, 207:5-25.

6.      During an ECC staff meeting on August 22, 2012, the staff was informed that the first time they exceed their weekly hours by more than 15 minutes would result in a verbal reminder, their second violation would result in a written warning, and the third violation would result in a Memorandum of Understanding ("MOU").  Ex. B, Brungard Depo., 31:9-24.  The January 18, 2013 memo changed the discipline procedure to receiving a written warning the first violation of going over their weekly hours by more than 15 minutes, a MOU the second violation, and HR action the third violation.  MSJ, Ex. C to Ex. 3.

7.      On November 5, 2012, Brungard sent Chavez a written warning for exceeding her work hours the prior week.  MSJ, Ex. A to Ex. 3.  Then on November 12, 2012, Aubuchon had a verbal conversation with Chavez regarding working her weekly hours.  Ex. C, Timeline of Events.  Although Chavez had not gone over her weekly hours since speaking to Aubuchon, Aubuchon directed Brungard to give Chavez a MOU on November 26, 2012 regarding her weekly hours.  MSJ, Ex. B to Ex 3; Ex. D, Chavez Time Sheets.

Between the time Chavez received a MOU on November 26, 2012 and the end of the 2012-2013 school year, Chavez only exceeded her weekly hours by more than 15 minutes one

(1) time – the week of March 4, 2013.  *Id.*  Chavez received a written warning about the week of March 4, 2013.  MSJ, Ex. D to Ex. 3.  On May 3, 2013, Chavez also received a Letter of Reprimand ("LOR") for going over her hours the week of March 4, 2013.  MSJ, Ex. E to Ex. 3.  Chavez then received on May 3, 2013 an Amended LOR for exceeding her hours the week of March 4, 2013.  MSJ, Ex. F to Ex. 3.  This Amended LOR was given because Chavez had forgotten to clock in or out, not because of any alleged continued violations as the Defendant states in their MSJ.  Ex. B, 44:2-10; MSJ, ¶¶ 18-19.

Chavez was then given another MOU on December 13, 2013.  MSJ, Ex. E to Ex. 2. Chief Human Resources Officer Kirk LeDay ("LeDay") gave this MOU to Chavez for missed clock in and/or clock outs and for exceeding her work hours.  *Id.*  At the time this MOU was given, Chavez had only gone over her weekly work hours by more than 15 minutes one (1) time during the 2013-2014 school year – the week of November 11, 2013.[1]  Ex. E, 2013-2014 Time Chart.  Chavez had already received a written warning for exceeding her hours that week.  MSJ, Ex. A to Ex 4.

8.      Chavez was reprimanded more often and more severely than her colleagues for similar alleged violations.  Forgetting to clock in or out was a common mistakes among Chavez' colleagues, notwithstanding the Defendant's training.  During the 2012-2013 and 2013-2014 school years, 15 other ECC employees forgot to clock in or out, ten (10) of whom did so as many or more times than Chavez.  Ex. F, ECC Employee Timesheets; Ex. E.  However, Ms. Chavez was the only individual to receive any discipline for doing so.  Ex. G, LeDay Depo., 35:1-11; Ex. H, Aubuchon Depo., 103:9-104:5; MSJ, Ex. E of Ex. 2.

---

[1] Chavez had also worked over her hours the week of October 28, 2013.  Ex. E.  However, there was approved overtime that week due to the Halloween Carnival.  Ex. H, 111:5-9.

In addition, inadvertently working overtime was also common.  For example, during the 2012-2013 school year, 12 other ECC employees exceeded their works hours by more than 15 minutes.  Ex. F.  While true that ECC employees, including Marilyn Ellsworth Brown ("Brown"), Brungard, and Aubuchon sent reminder emails to Chavez and her colleagues regarding going over their weekly work hours by more than 15 minutes, MSJ, ¶ 12, Chavez was targeted more often than her colleagues who had a similar number of alleged violations.  During the 2012-2013 school year, only three (3) of them were provided with one (1) written warning each despite the fact that these three (3) employees had exceeded their weekly work hours by more than 15 minutes more than one (1) time.  Ex. E, Martinez, Hernandez, Rodriguez.  During the 2013-2014 school year, ten (10) other ECC employees exceeded their weekly work hours by more than 15 minutes as many or more times than Chavez.  Ex. F.  However, while Chavez was given a MOU in December 2013 for going over her hours by more than 15 minutes three (3) times, other employees who engaged in the same conduct five (5) or six (6) times only received two (2) written warnings/emails for doing so.  *Id.*; MSJ, Ex. E to Ex. 2.

9.      In response to MSJ ¶ 18, working after clocking out was commonplace among her colleagues.  For example, Teresia Neal ("Neal") regularly worked off the clock.  Ex. I, Neal Depo., 10:20-11:4.  After she clocks out, she cleans and prepares materials; sometimes she takes work home, although she knows she is not supposed to.  *Id.* at 11:5-9.  Wright also worked off the clock.  Also, two other ECC employees were given either an email or verbal warning about working after being clocked out.  Ex. J, Staff Member Documentation, pp. 2, 3.  In addition, other employees, such as Hollie Mergenthal would have other employees clock them in or out.  Ex. S, Aubuchon Email.

10.     Defendant's assertion that Chavez never complained to anyone about her belief that somebody was altering her time clock entries is incorrect.  MSJ, ¶ 20.  In fact, she reported her concern to her union representative, John Whetzel ("Whetzel").  Ex. A, 159:13-16.  She did not report to Brungard or Aubuchon because she felt it would be futile to report to the "manipulators themselves."  *Id.* at 159:25-160:4.  In addition, an employee in the Defendant's technology services department told Chavez that there had been many logins on her computer by many Defendant employees.  MSJ, Ex. J to Ex. 2.

11.     In the evaluation dated May 17, 2013, Brungard rated Chavez "Proficient" in six (6) of the nine (9) rated categories.  MSJ, Ex. G to Ex. 3.  Those areas in which Brungard rated Chavez "Proficient" were: Decision-making; Adaptability; Motivation; Work Environment; Attitude; Growth; and Ethics.  *Id.*

Chavez's 2012-2013 performance evaluation was a gross misrepresentation of her performance and contains conflicting information.  For example, under Standard II – Job Management, Brungard rated Chavez' performance in the area of Time Management as "In Progress."  Ex. K, 2012-2013 Evaluation, p. 3.  Brungard indicated that Chavez "[h]as difficulty in managing and prioritizing tasks to meet timeliness," however, she did not also indicate that Chavez "[s]hows inconsistency in prioritizing tasks to meet deadlines" in the area of Productivity under Standard III.  *Id.* at p. 3, 4.  In addition, Brungard incorrectly indicated under Time Management that Chavez exceeded her weekly hours 12 times.  *Id.* at p. 3; Ex. D.

Pursuant to the Collective Bargaining Agreement between the District and ESPs ("CBA"), prior to rating an employee's performance as unsatisfactory, the employee must be advised of perceived deficiencies and provided a reasonable amount of time to improve those deficiencies.  Ex. L, CBA, Article 17-4.  The "In Progress" rating for Reliability was based on

alleged absences, deficiencies Chavez was not advised of.  Ex. K, p. 3.  In addition, the "In Progress" ratings for Conflict Resolution and Time Management were based on deficiencies brought to Chavez' attention to which she improved.  *Id.*

Brungard rated Chavez' 2012-2013 overall performance as "Unsatisfactory.  *Id.* at p. 6. A rating of "Unsatisfactory" requires that there are "sufficient In Progress" ratings in one or more standards.  *Id.*  However, Chavez did not have a "sufficient" number of "In Progress" ratings.  Instead, she had three (3) total "In Progress" ratings in two different standards, out of a total of 16 performance areas.  *See Id.*  An "Unsatisfactory" rating also requires that the employee "[h]as not achieved the objectives of the position.  *Id.* at p. 6.  Again, to state that Chavez did not achieve the objectives of her position when she received 14 "Proficient" ratings is a gross misrepresentation of her performance.

12.     For just 45 minutes, Chavez expressed an interest in moving to Hodgkins.  Ex. A, 196:24-197:5.  Ultimately, she did not volunteer to make the move.  *Id.* at 197:8-11.

13.     Chavez reported to work at Hodgkins on February 19, 2014.  *Id.* at 206:23-25. Unfamiliar with the protocols at a new school, she checked in at the front office.  *Id.* at 207:5-9; 208:1-5.  Chavez had never worked as an ESP at any school besides ECE.  *Id.* at 208:6-9. Chavez' confusion with the procedures at Hodgkins is evidenced by the fact that she initially signed in on a form titled "Guest Teacher/ESP Substitute Sign-in Sheet."  MSJ, Ex. F to Ex. 2. In the morning, a woman named Rosa at Hodgkin's front desk clocked in Chavez.  Ex. A, 207:10-18, 208:13-17.  It was not until the end of the day that a computer was set up so that Chavez could clock in and out.  *Id*. at 211:11-14.  Chavez did clock out that afternoon.  *Id.* at 211:15-16.  Chavez was then put on administrative leave for allegedly not clocking in or out on that day.  MSJ, Ex. H to Ex. 2.

14.     Whetzel, who had been working closely with Chavez throughout the above identified allegations, told Chavez of the Defendant's intention to fire her.  Ex. A, 220:7-10. Facing the prospect of termination, Chavez submitted her letter of resignation.  *Id.* at 220:11-14.

## ARGUMENT

### I.     Standard Of Review

To prevail on a motion for summary judgment, Defendant must demonstrate "that there is 'no genuine issue as to any material fact' and that it is 'entitled to judgment as a matter of law.'" *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (quoting Fed. R. Civ. P. 56). In applying this standard, courts view the factual record and draw all reasonable inferences in favor of the non-movant.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  An issue is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### II.     The *Faragher/Ellerth* Affirmative Defense Does Not Bar Chavez' Hostile Work Environment Claims

Under the *Faragher/Ellerth* analysis, a defendant asserting the defense must establish two necessary elements: (1) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  *Helm v. Kansas*, 656 F.3d 1277, 1285 (10th Cir. 2011) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).

The Defendant argues that the first element is established because it had appropriate discrimination policies in place, pointing to Board Policies AC-R and ACE-R.  The problem with that argument is that the Defendant did not follow those polices in the instant case.  Board Policy

AC-R explicitly states that "[a]ll [discrimination] reports received by … principals … shall be promptly forwarded to the compliance officer" – implying that an individual may make a complaint to their principal rather than the compliance offer.  MSJ, Ex. A to Ex. 2.  In the instant case, Chavez reported to Brungard and Aubuchon that she felt discriminated against by Wright in or about April 2012.  Ex. A 60:15-21.  Chavez also reported to Aubuchon at the end of the 2011-2012 school year that because of the depression she was experiencing as a result of the actions by Wright.  *Id.* at 119:25-121:3.  However, Aubuchon and Brungard did not forward Chavez' complaint to the Defendant's compliance officer or take any other action to address it. Therefore, the Defendant did not exercise reasonable care to prevent and correct the harassing behavior.

The Defendant argues that Chavez acted unreasonably by failing to file a complaint directly with the Defendant's compliance officer pursuant to Board Policy AC-R.  However, Chavez complaint to Brungard and Aubuchon, actions which are clearly authorized by Board Policy AC-R inasmuch as this policy explicitly requires principals and assistant principals to forward complaints that they received form employees to the Defendant's compliance officer.

Furthermore, the case law does not hold that the only way that an employee can act reasonably is by taking advantage of corrective opportunities provided by the employer; rather, the case law indicates that employees can act reasonably by taking actions to avoid further harm. *Helm*, 656 F.3d at 1285.  Here, Chavez reported the discrimination to Brungard and Aubuchon and also filed charges of discrimination with the EEOC in June of 2012 and July 2013.  MSJ, Exs. C and D to Ex. 2.  Both filings were reasonable attempts by Chavez to avoid harm.  Because Chavez took reasonable steps to avoid harm, the Defendant cannot establish that she

unreasonably failed to take advantage of preventive or corrective opportunities.  Thus, the

*Faragher/Ellerth* defense does not bar Chavez' hostile work environment claims.

## II.     Whether Chavez Was Subjected To A Hostile Work Environment Is A Question Of Fact, And Is Therefore Unsuited For Summary Judgment

To survive summary judgment, Chavez need only show that, under the totality of the

circumstances, (1) the harassment was pervasive *or* severe enough to alter the terms, conditions,

or privilege of employment, and (2) the harassment was based on her ancestry or disability.

*Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir. 1997).  The applicable test for a hostile

work environment asks whether the plaintiff was offended by the work environment and whether

a reasonable person would likewise be offended.  *Hernandez v. Valley View Hosp. Ass'n*, 684

F.3d 950, 957 (10th Cir. 2012).  "'[There] is not, and by its nature cannot be, a mathematically

precise test'" for a hostile work environment claim.  *Id.* (quoting *Harris v. Forklift Systems, Inc.*,

510 U.S. 17, 22 (1993)).  Courts consider factors such as the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating; and whether it

unreasonably interferes with an employee's work performance.  *Id.* at 957-58.  Importantly,

"[t]he severity and pervasiveness evaluation [of a hostile work environment claim] is particularly

unsuited for summary judgment because it is quintessentially a question of fact."  *Id.*

In its MSJ, Defendant argues that cites seven (7) age-related or disability-related

offensive comments made over the course of 17 months are insufficient as a matter of law and

that five additional comments/incidents should not be considered.  MSJ, pp. 10-11.  However, in

*Hernandez*, the 10th Circuit held that seven (7) to ten (10) racially insensitive and offensive

comments over approximately fourteen months was sufficiently pervasive for a rational

factfinder to conclude that the plaintiff and a reasonable person to be offended.  684 F.3d at 958.

Consequently, Chavez was subjected to 12 offensive comments/actions over a 17-month period.

Further, some of these comments were particularly egregious and humiliating.  In one instance,

for example, Chavez was asked whether, due to her weight, she was "able to get on top of [her]

husband during sex."  Ex. A, 48:14-15.  As another example, when Chavez expressed interest in

a job opening at a middle school, Wright commented, "Do you think you could do all that

walking?"  *Id.* at 58:7-13.  The severity or humiliating nature of these comments are factors

which weigh in favor of finding that a hostile work environment existed.  Furthermore, the five

(5) additional comments/incidents should be counted as part of the harassment because they are

comments/actions on the part of individuals who believed Chavez was somehow limited because

of her weight and/or age.

Whether these and other offensive comments are objectively offensive is

"quintessentially a question of fact."  *Hernandez*, 684 F.3d at 958.  As such, the determination

whether Chavez was subjected to a hostile work environment is unsuited for summary judgment.

## III.    Chavez Exhausted Administrative Remedies With Regard To Her Third Claim For Relief, i.e., Defendant's Failure To Accommodate For Her Disability

The Tenth Circuit liberally construes EEOC charges of discrimination when determining

whether administrative remedies have been exhausted.  *Jones v. UPS, Inc.*, 502 F.3d 1176, 1186

(10th Cir. 2007).  Even if a charge of discrimination does not contain specific information

regarding the Defendant's alleged failure to accommodate, it may still be sufficient if it

"describe[s] generally the action or practices complained of."  29 C.F.R. § 1601.12(b).  Chavez

checked the "Disability" box on her June 28, 2012 EEOC Charge of Discrimination.  MSJ, Ex. C

to Ex. 2.  In addition, Ms. Chavez wrote that she had "been told to apply at another school

district."  *Id.*  This statement is precisely the basis for her third claim of relief because, when

Chavez requested a reasonable accommodation, Aubuchon told her to apply to another school

district.

11

"A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *MacKenzie v. Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005).  The issue as to whether or not the Defendants failed to reasonable accommodate Chavez was discussed both in the Defendant's Response and Chavez' Rebuttal to her first charge of discrimination.  Ex. M, District's Response; Ex. N, Chavez' Rebuttal.  As such, it is clear that both the Defendant and Chavez reasonably expected that the EEOC would investigate this claim during the administrative process.  Chavez' reasonable accommodation claim was within the scope of the EEOC investigation as reasonably expected by the parties.

**IV.     Chavez Makes A *Prima Facie* Showing That She Is "Disabled" Under The ADA**

The Defendant asserts that Chavez is not disabled in order to defeat Chavez' reasonable accommodation claim, but ignores the various ways a plaintiff might establish the existence of a disability under the ADA.  The ADA defines "disability" broadly as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  *See* 42 U.S.C.A. § 12102(2).  Thus, a plaintiff is considered "disabled" if she establishes the existence of an actual disability, a record of disability, or if her employer regards her as disabled.  *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129-32 (10th Cir. 2003).

A plaintiff establishes the existence of an actual disability by showing that an impairment substantially limits at least one major life activity.  *Id.* at 1129.  To do so, first, the plaintiff must have a recognized impairment; second, the plaintiff must identify one or more appropriate major life activities; and third, the plaintiff must show that the impairment substantially limits one or more of those activities.  *Id.*  Whether the plaintiff has an impairment within the meaning of the

ADA is a question of law for the court to decide, but determining whether the impairment substantially limits the major life activity is a question of fact for the jury. *Id.*

Chavez was diagnosed with depression in 2004. Ex. A, 244:7-9. She sought "extensive treatment" from a therapist from 2004 through her constructive discharge in 2014. *Id.* at 244:10-15. While still employed by the Defendant, Chavez self-medicated for her depression and anxiety through eating. *Id.* at 262:14-19. Chavez also took prescription medication to treat her anxiety. *Id.* at 256:22 – 257:1. Chavez took a medical leave of absence in 2010 because of her depression, anxiety, and panic. *Id.* at 263:19 – 264:23. Aubuchon, as principal, knew about this leave and its underlying causes. *Id.* at 264:10-17. Chavez took another medial leave of absence in 2011 when she experienced a recurrence of her depression and anxiety symptoms in the wake of her dealings with Wright. *Id.* at 265:3-15. Aubuchon knew about that medical leave, and the reasons for it, as well. *Id.* at 265:16-21. Under the ADA, "major life activities" include, but are not limited to, sleeping concentrating, thinking, and communicating. 42 U.S.C. § 12102(1)(A). The determination of a disability is to be made without regard to mitigating measures. *Id.* at (4)(E)(i). Chavez' depression and anxiety limited her ability to sleep, concentrate, think, and communicate. The determination whether her impairment substantially limits a major life activity is one for the jury. *Doebele,* 342 F. 3d at 1129. As such, Chavez can properly be considered disabled under the ADA.

"To have a record of…impairment, a plaintiff must have a history of, or been misclassified as having, an impairment that substantially limited a major life activity." *Sorensen v. Univ. of Utah Hosp.*, 194 F.3d 1084, 1086 (10th Cir. 1999). Chavez' depression and anxiety go back to 2004. Ex. A, 244:7-9. She took two (2) medical leaves of absence in connection with her depression and anxiety, and her supervisor – Aubuchon – knew about both. Ex. O, FMLA

Documents; Ex. A. 264:10-13, 265:16-18.  Chavez undoubtedly has a history of depression and

anxiety.  Those conditions substantially limited Chavez' ability sleep, concentrate, think, and

communicate.  Therefore, she has a record of impairment.

**V.      The Defendants Failed To Engaged In The Interactive Process**

Discrimination under the ADA includes failing to make "reasonable accommodations to

the known physical or mental limitations of an otherwise qualified individual with a

disability…"  *Valdez v. McGill*, 462 Fed. App'x 814, 817 (10th Cir. 2012)  (quoting 42 U.S.C. §

12112(b)(5)(A)).  In order to establish a prima facie failure to accommodate claim under the

ADA, Chavez must show (1) she is a qualified individual with a disability; (2) the employer was

aware of her disability; and (3) the employer failed to reasonably accommodate the disability.

*Allen v. SouthCrest Hosp*., 455 F. App'x 827, 836 n.4 (10th Cir. 2011).

As discussed in Section IV(A), *supra*, Chavez was disabled and had a record of a

disability under the ADA.  Aubuchon was aware of Chavez' disability.  Ex. A, 264:10-17,

265:16-21.  Chavez spoke to Aubuchon and asked for a transfer due to the depression and

anxiety she was feeling.  *Id.* at 120:18-121:3, 247:7-9, 264:21-23.  This conversation was

sufficient to put Mr. Aubuchon and the Defendant on notice that Ms. Chavez was requesting an

accommodation because of a medical condition.  *See* EEOC, NOTICE NO. 915.002,

ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE

HARDSHIP UNDER THE ADA (2002), Q&A 1 (in order to request an accommodation, the

employee must "let the employer know that s/he needs an adjustment or change at work for a

reason related to a medical condition"); *see also EEOC v. C.R. Eng., Inc*., 644 F.3d 1028, 1049

(10th Cir. 2011).  Once Ms. Chavez provided this notice, the Defendant was required to engage

in good faith in an interactive process regarding this matter with Ms. Chavez.  *Smith v. Midland*

*Brake*, Inc., 180 F.3d 1154, 1172 (10th Cir. 1999).  However, Aubuchon failed to engage at all in the interactive process.

The Tenth Circuit has ruled that a "per se rule" that replacing a supervisor is never a reasonable accommodation is inconsistent with ADA case law.  *Felix v. City & County of Denver*, 729 F. Supp. 2d 1243, 1263-64 (D. Colo. 2010).  In addition, the Defendant's statement that such a transfer would not be reasonable because they do not have a practice of employee transfers is incorrect given that while they did not transfer Chavez when she requested it at the end of the 2011-2012 school year, they did transfer Chavez in February 2014.

**VI.    Chavez Can Satisfy The Elements Of A Retaliation Claim Based On Her First Charge Of Discrimination**

*A.   Chavez Was Subject To Adverse Employment Actions*

The Tenth Circuit interprets the phrase "adverse employment action" liberally.  *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998).  In the context of retaliation, an "adverse employment action" is one that "a reasonable employee would [consider] materially adverse" or that "might dissuade a reasonable worker from making or supporting" a charge of discrimination.  *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1213 (10th Cir. 2008).  In making this determination, courts "take a case-by-case approach, examining the unique factors relevant to the situation at hand."  *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004).

After Chavez filed her first charge of discrimination on or around June 28, 2012, Chavez received three (3) written warnings, two (2) MOUs, two (2) LORs, and an unsatisfactory evaluation.  MSJ, Exs. C and E to Ex. 2, Exs. A, B, C, E, F, G to Ex. 3, and Ex. A to Ex. 4.  All of these disciplinary documents were provided as a result of Chavez allegedly exceeding her weekly work hours and/or forgetting to clock in and/or out.  At the same time, other ECC employees who were also exceeding their weekly work hours and/or forgot to clock in and/or out

were not provided near the same amount or severity of discipline.  See ¶¶ 7-8 above.  These disciplinary documents were steps in the Defendant's series of adverse actions against Chavez which resulted in her termination.  A series of allegedly adverse actions can be analyzed in the aggregate to determine whether, taken together, they are sufficient to be cognizable.  *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004).  In the present case, a "reasonable employee" would find this series of adverse actions suffered by Chavez, given that she was more often and severely disciplined for actions that other ECC employees also took, to be "materially adverse" and these actions would "dissuade a reasonable worker" from making a charge of discrimination.  *See Somoza*, 513 F.2d at 1206.  Therefore, Chavez did suffer from adverse employment actions and summary judgment is not appropriate.

> B.  *Chavez Establishes A Causal Connection Between Her First Charge Of Discrimination And The Adverse Actions*

Chavez filed her first charge of discrimination in the summer preceding the 2012-2013 school year.  MSJ, Ex. C to Ex. 2.  The EEOC did not sent the Defendant Chavez' charge until July 5, 2012 and it is plausible that the Defendant did not receive the charge until after that date.  Ex. P, Notice of Charge.  Given that the Defendant is a school district, school was not in session and Chavez was not working when the Defendant received notice of the 2012 Charge.  Consequently, the Defendant had no ability to undertake any retaliatory actions against Chavez until after Chavez returned to work in or about August 20, 2012.  Ex. Q, 2012-2013 Preschool ESP Calendar.  At most, two and one-half months passed between Chavez' return to the school and the first of the Defendant's retaliatory actions – the November 5, 2012 written warning.

In the Tenth Circuit, "[a] causal connection *may* be shown by evidence of circumstances that justify an inference of retaliatory motive, *such as* protected conduct closely followed by adverse action."  *Oneal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)

(emphasis added).  Absent close temporal proximity between the protected activity and the retaliatory conduct, courts look to whether the plaintiff offers additional evidence to establish causation.  *Id.*  Indeed, temporal proximity is not determinative of whether a causal connection is established.  *Marx v. Schnuck Mkts.*, 76 F.3d 324, 329 (10th Cir. 1996).

Other facts in this case show a causal connection.  First, Chavez was reprimanded more often and more severely for allegedly exceeding her weekly work hours and/or forgetting to clock in and/or out than other ECC employees similarly situated were not.  See ¶¶ 7-8 above. Second, the Defendants disciplined Chavez twice for one alleged instance of exceeding her work hours – the week of October 29, 2012.  See ¶ 7 above.  The Defendants also disciplined Chavez three (3) times for the allegation that she exceeded her work hours the week of March 4, 2013. *Id.*  No other employees was disciplined more than once for exceeding their works hours.  See ¶ 8 above.  Lastly, at the end of the 2012-2013 school year, she received the first "unsatisfactory" performance evaluation of her career.  Ex. A, 179:21-180:2; Ex. K.  Prior to this evaluation, the last time Chavez was given a formal performance evaluation was the 2010-2011 school year, prior to her filing her 2012 EEOC Complaint in June 2012.  Ex. R, 2010-2011 Evaluation.  In this evaluation, Chavez' performance was rated overall as "Superior," the second highest of five possible ratings.  *Id.*  Chavez's 2012-2013 performance evaluation was a gross misrepresentation of her performance and contains conflicting information.  See ¶ 11 above.  Based on this additional evidence, Chavez is able to establish a triable fact as to whether there is causal link between her protected activity and the Defendant's retaliatory conduct.

**VII.    Chavez Can Satisfy The Elements Of A Retaliation Claim Based On Her Second Charge Of Discrimination**

*A.    Chavez Was Subjected To Adverse Employment Actions*

Contrary to the Defendant's argument, Chavez was constructively discharged from the Defendant.  The Defendant's argument is based upon a misapprehension of the nature of Chavez' claim.  Chavez does not allege that she was constructively discharged due to objectively intolerable working conditions; rather, she alleges that she was faced with a choice between resigning and being fired.  Amended Complaint (Doc. 17), ¶ 56.  It is well-established in the Tenth Circuit "that an employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired." *Burks v. Okla. Pub. Co*., 81 F.3d 975, 978 (10th Cir. 1996).

After the Defendant placed Chavez on administrative leave on February 28, 2014, Chavez discussed her situation with her union representatives.  Ex. A 219: 8-12.  One representative, Whetzel, communicated to Chavez the Defendant's intention to fire her.  *Id.* at 219:25-220:10.  Chavez found herself faced with a choice between resigning and being fired; she chose to resign. *Id.* at 220:11-14.   The Defendant claims that the Defendant had yet to make a decision about her employment when she resigned.  MSJ, p. 16.  This fact is disputed and a reasonably factfinder could resolve this issue either way.  As such, the Defendants are not entitled to summary judgment on this issue. *See Anderson*, 477 U.S. 242 at 247-48.

As discussed in Chavez' Response to Motion to Dismiss (Doc. 19, pp. 14-15), the fact that Ms. Chavez had the opportunity to grieve her termination does not support a finding that Chavez was not subject to a constructive discharge.  Chavez had no property interest in her position and any decision in the grievance process would have been advisory only.

**B.   *Chavez Establishes A Causal Connection Between Her First Charge Of Discrimination And The Adverse Actions***

Chavez filed her second charge of discrimination on July 30, 2013, just before the start of the 2013-2014 school year.  MSJ, Ex. D to Ex. 2.  The Defendant became aware of the second charge sometime thereafter, although Leday does not recall exactly when.  Ex. G, 10:12-16.  In February of that school year, Chavez was involuntarily transferred to Hodgkins, Ex. A, 195:18-22, although it is not the Defendant's practice to move employees from one location to another. Ex. G, 19:3-6.  Employees are sometimes forced to transfer, typically when the Defendant loses staffing positions, which was not the case here.  *Id.* at 19:10-14; Ex. H, 129:25-130:7. Importantly, Aubuchon, not Leday, made the decision to force-transfer Chavez.  Ex. G, 36:18-37:3.  Aubuchon, of course, is one of the persons alleged to have discriminated against Chavez. See, e.g., Ex. A, 111:23-112:6.

At the time Chavez had been transferred, she had become consistent in not exceeding her weekly hours.  In fact, at the time Chavez was told she was going to be transferred to Hodgkins, the week of February 10, 2014, Chavez had only exceeded her weekly work hours one (1) time during the 2013-2014 school year.  See ¶ 7 above.  Then, on her first day at Hodgkins, Chavez had another individual clock her in because she was not sure where she was to do so or the protocol at Hodgkins.  Ex. A, 207:10-18, 208:13-17.  A computer was set up at the end of the day for Chavez to clock and in and she used it to clock out that day.  *Id.* at 211:11-16.  The fact that Chavez had not exceeded her works hours since the week of November 11, 2013, she is involuntarily transferred to a different school, and the Defendant put her on administrative leave for allegedly not clocking in or out on this first day, and later informed her representative that she was going to be fired, creates a triable issue as to whether there is causal link between her protected activity and the Defendant's retaliatory conduct.

**VIII.   The Defendant's Reasons Its Actions Are Pretext For Retaliation**

The Tenth Circuit recognizes that "'[p]retext can be shown in a variety of ways,'" and

"'there is no one specific mode of evidence required to establish the discriminatory inference.'"

*Riser v. QEP Energy*, 776 F.3d 1191, 1200 (10th Cir. 2015) (quoting *Conroy v. Vilsack*, 707 F.3d

1163, 1172 (10th Cir. 2013)).   Pretext can be shown by "such weaknesses, implausiblities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence and

hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.*

Here, the Defendant cites timeclock violations as a reason for its decision to discipline

Chavez.   However, the Defendant administered its own discipline policies inconsistently.   See ¶¶

7-8 above.   The inconsistencies with which the Defendant applied its discipline policies could

lead a reasonable factfinder to conclude that the Defendant's discipline of Chavez based on

allegations of timeclock violations are pretext for retaliation.   In addition, the Defendant put

Chavez on administrative leave, and arguably planned on terminating her, because of an alleged

timeclock violation on February 19, 2014, her first day at Hodgkins.   MSJ, Ex. H to Ex 2.   Given

the fact that Chavez had only exceeded her weekly hours one (1) time during the 2013-2014

when she was transferred to Hodgkins, and the fact that it was her first day at this new school the

allegation is based on, there is a triable issue as to whether or not these actions show that the

Defendant's alleged legitimate reason for its action is pretextual.

## CONCLUSION

WHEREFORE, for the aforementioned reasons, the Plaintiff, Roberta Chavez,

respectfully requests that this Court deny the Defendant's Motion for Summary Judgment

[Docket ID # 28] in its entirety.

DATED this 5th day of February, 2016.

Respectfully submitted,

_____
Brooke M. Copass, #45044
Sharyn E. Dreyer, #19637
Attorneys for Plaintiff
Colorado Education Association
1500 Grant Street
Denver, Colorado 80203
(303) 837-1500
bcopass@coloradoea.org
sdreyer@coloradoea.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of February, 2016, a true and correct copy of the foregoing **RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was electronically filed with service requested as follows:

Mary Gray, Esq.
Holly Ortiz, Esq.
Attorneys for Defendant
Semple, Farrington, & Everall, P.C.
1120 Lincoln Street, Suite 1308
Denver, CO 80203


/s/ Bridget Calip
Bridget Calip